IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

ERIC STEPHEN BUWALA,  )  CASE NO. 5:18CV1291
 )
 Plaintiff,  )
 )  JUDGE JAMES S. GWIN
 v.  )
 )  MAGISTRATE JUDGE
 )  KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL  )
SECURITY ADMINISTRATION,  )
 )  **REPORT AND RECOMMENDATION**
 Defendant.  )

Plaintiff Eric Stephen Buwala ("Buwala") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying his application for

Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and

Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

## I. Procedural History

On July 29, 2015, Buwala protectively filed an application for DIB, alleging a disability

onset date of July 15, 2014.  Tr. 15, 86, 169.  He alleged disability based on the following: C3-

C7 cervical fusion (spine and neck injury), cervical discs damaged in motor vehicle accident,

cervical radiculopathy, and permanent nerve damage in hands.  Tr. 293.  After denials by the

state agency initially (Tr. 86) and on reconsideration (Tr. 99), Buwala requested an

administrative hearing.  Tr. 113.  A hearing was held before an Administrative Law Judge

("ALJ") on August 16, 2017.  Tr. 37-74.  In his September 18, 2017, decision (Tr. 15-29), the

1

ALJ determined that there are jobs that exist in the national economy that Buwala can perform, i.e., he is not disabled.  Tr. 27-29.  The Appeals Council denied Buwala's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Buwala was born in 1973 and was 40 years old on his alleged onset date.  Tr. 169.  He graduated from high school and had some college; he also became a certified Novell network engineer in 1999.  Tr. 47-48.  He presently works part-time as a director of sales and marketing for a company owned by his parents, and had previously done this work full time.  Tr. 48-49.

### B. Relevant Medical Evidence

In 2011, Buwala had bilateral carpal tunnel release surgery.  Tr. 870.

In April 2012, Buwala was involved in a car accident and complained of neck pain.  Tr. 443.

An April 2013 EMG of Buwala's upper extremities showed mild bilateral carpal tunnel changes with no evidence of mononeuropathy or cervical radiculopathy.  Tr. 848.

In April 2014, an x-ray of Buwala's cervical spine showed multi-level degenerative changes: spondylosis at C2-3 anteriorly and C3-4 posteriorly, mild degenerative changes of the facets and uncovertebral joints at multiple levels, and mild encroachment on the neuroforamina at C3-4 consequent to spondylosis.  Tr. 1021.  An MRI of his cervical spine showed multi-level cervical spondylosis superimposed upon baseline cervical congenital canal narrowing, multi-level contact of the cord or cord flattening that appeared most notable at C6-7, and multilevel foraminal narrowing.  Tr. 1022-1023.

On July 15, 2014, Buwala's alleged onset date, he underwent cervical decompression and

fusion surgery performed by neurosurgeon Dane J. Donich, M.D.  Tr. 669.  He had reported neck pain caused by the motor vehicle accident in April 2012, which had progressively worsened and radiated into his shoulders and head.  Tr. 679.  He also complained of cramping in his bilateral hands.  Tr. 679.  His functional status was described as moderate.  Tr. 679.  Upon exam prior to his surgery, he had plus one pitting edema in his bilateral lower extremities, some redness in his lower legs, and he weighed 469.2 pounds.  Tr. 680.  He had full strength in his extremities, full sensation, and intact cranial nerves.  Tr. 680.  He was discharged from the hospital two days after surgery, diagnosed with cervical myelopathy, cervical stenosis, intractable cervical pain and radiculopathy, morbid obesity, hypertension, and lower extremity swelling.  Tr. 666.

On July 28, Buwala saw certified nurse practitioner Jessica Herraiz at Dr. Donich's office for a post-operative follow-up.  Tr. 990-991.  He reported neck pain and bilateral arm pain, numbness and weakness.  Tr. 990.  He was wearing a cervical neck collar and Herraiz removed his sutures and recommended he start physical therapy in a month.  Tr. 991.  On August 5, Buwala reported that he continued to experience neck pain and bilateral arm pain, numbness and weakness.  Tr. 987.  Upon exam, he had a steady gait and was wearing his cervical collar.  Tr. 988.

On August 27, 2014, Buwala saw licensed professional clinical counselor Brian Tindall, Ph.D., and reported struggling with sadness and depression and feeling dependent and helpless since his surgery.  Tr. 1275.[1]

On September 4, 2014, an x-ray of Buwala's cervical spine showed surgical hardware and mild degenerative spurring at C2-3 with minimal narrowing of the anterior disc space and straightening of the cervical lordosis.  Tr. 1121.

---

[1] Dr. Tindall's handwritten notes are difficult to read and often illegible.  In this summary of medical evidence, the undersigned only references material in those notes that is legible.

On September 5, 2014, Buwala saw his primary care physician Pennie Marchetti, M.D., for a check-up.  Tr. 870.  He was still having pain after his fusion surgery and numbness in his arms and hands.  Tr. 870.  He also reported having "some issues" with depression, he was seeing a counselor, and he did not want to start medication.  Tr. 870.  He stated that he realizes his current situation is not forever and that he can deal with it adequately.  Tr. 870.  He was not watching his diet, consumed on average two alcoholic drinks a night, and had gained weight.  Tr. 870.  Upon exam, his neck was supple and non-tender, his incision was well-healed, he had no edema in his extremities, and normal pulses.  Tr. 871.  He had an appropriate affect, normal eye contact, appropriate grooming, and a pleasant mood.  Tr. 871.

On September 10, 2014, Buwala saw Dr. Tindall and reported that he was still struggling with feeling dependent and helpless.  Tr. 1274.

On September 25, 2014, Buwala saw Dr. Donich for a follow-up.  Tr. 1003.  Buwala reported making some progress and felt best when he was in a recliner and wearing his cervical collar.  Tr. 1004.  He complained of a little sensory disturbance in his right thumb and index finger.  Tr. 1003.  Dr. Donich stated that Buwala was making excellent progress, his recent x-rays were satisfactory, he had no new neurological deficits, and he was to start physical therapy soon.  Tr. 1003.

On September 30, 2014, Buwala saw Dr. Marchetti complaining of pain in his right thigh due to sitting in a recliner that was too small for him for about 2 hours a day since his surgery.  Tr. 873.  The recliner pushed into his thigh.  Tr. 873.  The past week he had moved to a different chair but his thigh still hurt.  Tr. 873.  Upon exam, he had minimal edema bilaterally and was tender to palpation over the lateral portion of his thigh.  Tr. 873.

On October 20, 2014, Buwala began physical therapy with Matthew Toker.  Tr. 979.

Buwala stated that he had stopped wearing his cervical collar that week and that his neck felt

weak.  Tr. 979.  His extremity symptoms had resolved save for the second finger on his right

hand, which was numb.  Tr. 979.  He was working from home but wanted to return to his

workplace.  Tr. 979.  He reported not being able to hold up his neck at the end of the day.  Tr.

980.  Upon exam, flexion of his cervical spine was normal, extension was decreased with pain,

and he had pain with all motions at the end range.  Tr. 979.  His cervical spine strength was 4-/5.

Tr. 979.

On October 31, Buwala saw Dr. Marchetti for a recheck of his weight and neck.  Tr. 875.

He had stopped wearing his cervical collar and had been cutting back on his pain medication.

Tr. 875.

On December 5, 2014, Buwala saw Dr. Marchetti for his 6-month check-up.  Tr. 1108.

He reported being unable to exercise but he was doing physical therapy three days a week.  Tr.

1108.  He had lost some weight and was down to 435-440 pounds; he was doing Weight

Watchers online and had stopped drinking alcohol.  Tr. 1108.  His neck pain was gradually

improving.  Tr 1109.  He complained of depression and sleep apnea and was using a CPAP.  Tr.

1108.  He reported that he sometimes has trouble sleeping due to neck pain and that he

sometimes slept in a recliner.  Tr. 1108.  Upon exam, he had no edema, normal eye contact,

appropriate affect and grooming, and had a pleasant mood.  Tr. 1109.

On December 15, 2014, Buwala saw Dr. Donich for a follow-up appointment.  Tr. 940-

941.  His neck pain was 3/10, he was doing well in physical therapy and with electric

stimulation, he was tapering his Percocet, and he was back to work.  Tr. 940.  He reported altered

mobility, weakness, gait disturbance, loss of balance, and fine motor loss (write, type, button).

Tr. 940.  He denied limited range of motion and falls.  Tr. 940.  He felt that he was much

improved compared to his preoperative condition; his physical therapy was helping considerably and he really had no significant neck or arm pain.  Tr. 1002.  Upon exam, he had a steady gait. Tr. 940.  He weighed 450 pounds and Dr. Donich stated that Buwala remained morbidly obese. Tr. 940, 1002.  Dr. Donich noted no new neurological deficits and recommended a 6-month follow up and updated x-rays at that time.  Tr. 1002.

On December 10, 2014, Buwala told physical therapist Toker that he felt that his pain had plateaued at 3/10.  Tr. 942.  He reported decreased tension after the manual treatments at his prior visit and that he was able to make it through the workday without pain pills.  Tr. 942.  He had another manual treatment of his scalene and upper trapezius muscles for 10 minutes and stated that he felt looser.  Tr. 942.

On December 31, 2014, Buwala had his last physical therapy visit and stated that his neck pain had decreased to a 3/10 when at rest and increased to a 7-8/10 when he attempted to keep his neck upright and unsupported for more than 20 minutes.  Tr. 930.  Toker assessed him as having tolerated treatment well and that he had shown an improvement in strength; his cervical spine strength and bilateral shoulder strength had increased from 4-/5 to 5-/5.  Tr. 930. Toker advised that Buwala would benefit from continued therapy and weight loss.  Tr. 930.  He observed that, although Buwala had reported that his pain level had plateaued, he had also reported increased activity.  Tr. 930.

On March 10, 2015, Buwala saw Nurse Herraiz at Dr. Donich's office.  Tr. 927-929.  He reported that, a few weeks ago, he had been in another motor vehicle accident.  Tr. 927.  He had increased neck pain that radiated into his bilateral shoulders.  Tr. 927.  He did not go to the emergency room and his pain had not improved.  Tr. 927.  He again reported altered mobility, gait disturbance, and loss of balance, weakness, and fine motor use.  Tr. 928.  Upon exam, he

had a steady gait and 5/5 muscle strength in his upper extremities. Tr. 928. He was diagnosed with a cervical strain from a motor vehicle accident. Tr. 928. He refused a referral to a dietitian for weight loss and Herraiz ordered a cervical x-ray. Tr. 928. The x-ray showed evidence of a posterior cervical fusion at the C3-7 levels, no acute abnormality, and anterior endplate osteophytes noted at the C2-3 level. Tr. 1019.

On March 23, 2015, Buwala saw Dr. Donich to discuss the results of his recent x-ray. Tr. 924-925, 1001. Buwala's complaints regarding his symptoms remained the same as his prior visit in December: altered mobility, weakness, gait disturbance, loss of balance, and fine motor loss (write, type, button), and he denied limited range of motion and falls. Tr. 924-925. He now had bilateral shoulder pain but no arm pain. Tr. 924. He had not yet seen his pain management doctor. Tr. 1001. Upon exam, he had a steady gait, full upper extremity strength, and some tenderness to palpation and diminished range of motion of his cervical spine. Tr. 925, 1001. He had no new focal objective neurological deficits. Tr. 1001. Dr. Donich remarked that his recent x-rays showed "an expected postoperative appearance." Tr. 1001.

On March 25, 2015, Buwala saw his pain management doctor Maged Fouad, M.D. Tr. 887-890. Dr. Fouad's treatment record does not indicate he was aware of Buwala's second, recent motor vehicle accident in February 2015. Tr. 887, 889. Buwala denied that his pain was caused by a motor vehicle accident and stated that his pain was due to bulging discs. Tr. 887. His pain was throbbing, cramping, dull, and radiating, and ranged from 2/10 to 10/10 and averaged 6/10. Tr. 887. A long time spent standing and sitting made his pain worse; medication, heat/cold, resting, and sitting made his pain better. Tr. 887. Upon exam, Buwala was pleasant, morbidly obese, had a normal gait, strength and sensation, cervical spine tenderness, and mildly to moderately limited ranges of motion in his neck. Tr. 888-889. Dr. Fouad assessed neck pain;

degenerative disc disease, cervical; and cervical spinal stenosis.  Tr. 889.

On March 31, 2015, Buwala saw Nurse Herraiz at Dr. Donich's office complaining of problems at the incision site: pain, clear drainage, and a golf-balled sized lump.  Tr. 921.  Upon exam, he had a steady gait, 4+/5 cervical strength, and redness and edema around the incision site.  Tr. 922.  Herraiz cleaned the site and gave Buwala ointment and swabs.  Tr. 922.

On April 6, 2015, Buwala had a CT exam of his cervical spine, which showed evidence of the prior fusion, endplate hypertrophy at C2-3 with mild left foraminal stenosis, a small posterior disc bulge at C3-4 and mild bilateral foraminal stenosis, and endplate hypertrophy at C4-5 with mild right foraminal stenosis.  Tr. 1015-1016.  Buwala saw Dr. Donich on April 13, reporting a little drainage from his incision.  Tr. 1000.  He denied limited range of motion, gait disturbances, loss of balance, and weakness.  Tr. 919.  The doctor remarked that Buwala's incision looked good and blood work did not indicate an infection.  Tr. 1000.  He commented that Buwala's recent CT scan showed normal postoperative appearances.  Tr. 1000.  Upon exam, Buwala had a normal gait and 4+/5 cervical strength.  Tr. 919.  Dr. Donich opined that Buwala was doing well clinically and was to follow up in two weeks for another wound check.  Tr. 1000.

On May 21, 2015, Buwala saw Dr. Fouad for a routine office visit; his exam findings were the same as his prior visit.  Tr. 885-886.  Dr. Fouad refilled Buwala's medications, described his pain as "well managed," and noted that he was not a candidate for any interventional procedures.  Tr. 886.

On May 27, Buwala saw Nurse Herraiz for an incision check.  Tr. 913.  He reported that the numbness in his hands was improving.  Tr. 913.  Upon exam, he was calm, cooperative and coherent, had a steady gait, and cervical strength of 4+/5.  Tr. 914.  Herraiz pulled a suture loop out from the incision site.  Tr. 914.

On June 6, 2015, Buwala saw Dr. Marchetti for a check-up.  Tr. 1093.  He reported feeling depressed over his general situation and Dr. Marchetti diagnosed him with depressive disorder, not elsewhere classified.  Tr. 1093, 1094.  Buwala also reported that he "pretty much lives in recliner in basement" because his neck hurts if he sits for more than 15 minutes or sleeps in his bed.  Tr. 1093.  He was not watching his diet; he had been on Weight Watchers, losing 4-5 pounds a week, but stopped because he did not feel it was working fast enough.  Tr. 1095.  Dr. Marchetti advised that losing 4-5 pounds a week was more than what one should realistically expect and encouraged Buwala to start again; Buwala agreed.  Tr. 1094.

On August 6, 2015, Buwala saw Dr. Donich for a follow up.  Tr. 910-911.  He reported increased pain since his recent car accident, his right index finger was completely numb, he had intense nerve pain and weakness, and he could no longer sleep in his bed due to neck pain, instead sleeping in a recliner.  Tr. 910.  He had sharp pain at his neck incision that was worse when he turned his head.  Tr. 910.  Upon exam, he had 4/5 upper extremity strength and more point tenderness in his incision area to the right of midline since his accident.  Tr. 911, 999.  Dr. Donich gave him a prescription for an adjustable bed and ordered a nerve conduction study and a cervical MRI.  Tr. 999.

In August 2015, a nerve conduction study performed on Buwala's right upper extremity showed mild median nerve compression at the wrist, which the testing clinician noted was consistent with Buwala's history of carpal tunnel release approximately five years prior.  Tr. 1013.  The testing showed no evidence of motor nerve denervation or radiculopathy, and motor and sensory nerve responses suggested well-preserved axonal functioning.  Tr. 1010.  A cervical MRI showed mild multilevel spondylosis, and mild cord signal abnormality at C6-7, suggestive of mild cord myelomalacia.  Tr. 1055.  There was also mild kyphosis at C6-7 with mild

retrolisthesis and disc bulging, new since the April 2014 imaging.  Tr. 1055.

On August 31, 2015, Buwala saw Dr. Donich.  Tr. 998.  He still had some degree of neck pain and complained of sensory disturbance in his right index finger and, to a lesser degree, his right thumb.  Tr. 998.  He had no associated new focal objective neurological deficits.  Tr. 998. Dr. Donich recommended a cervical spine CT scan.  Tr. 998.

Buwala saw Dr. Fouad in September and October for medication refills; Dr. Fouad recommended Buwala remain active and in October stated that his condition was stable and his pain was well-managed on medications.  Tr. 1068, 1074.

On October 12, 2015, Buwala saw Dr. Donich for a follow-up.  Tr. 1047.  He complained of neck pain and hand numbness/tingling.  Tr. 1047.  Upon exam, he had a steady gait, normal cervical spine examination, and 4/5 strength in his upper extremities.  Tr. 1048.  Dr. Donich advised that the recent CT scan showed solid fusion at all levels except C3-4, where there was no bridging across the facet joint.  Tr. 1050, 1051.  Dr. Donich discussed additional treatment options and Buwala indicated that he would continue with his current, conservative treatment options and will follow up as needed.  Tr. 1050.

On October 19, 2015, Buwala saw Dr. Marchetti for a 3-month general checkup.  Tr. 1077.  He advised that he had been "very depressed" but that he no longer felt that way.  Tr. 1077.  Upon exam, he had an appropriate affect and pleasant mood.  Tr. 1078.

On December 17, 2015, Buwala saw mental health counselor Dr. Tindall.  Tr. 1271.  He reported that he "broke down in attorney's office" and Dr. Tindall wrote, "depressed?"  Tr. 1271. Buwala detailed his cervical spine history.  Tr. 1271-1272.  He stated that he was tearful, experienced a loss of interest, and that he was avoiding people.  Tr. 1272.  He also had anxiety and panic when driving.  Tr. 1272.  He reported the settlement from his first car accident and

stated that he was gearing up for litigation regarding his second accident; he had also applied for disability.  Tr. 1272.  He believed that he was not going to get better.  Tr. 1272.

On January 6, 2016, Buwala saw Rafal Z. Stachowicz, M.D., an orthopedic physician at the Summit Hand Clinic.  Tr. 1256.  He complained of pain in fingers of both hands and numbness in his right index finger and thumb.  Tr. 1256.  His symptoms were aggravated when grasping, eating, and buttoning.  Tr. 1256.  Pain medications helped his symptoms.  Tr. 1256.  Dr. Stachowicz diagnosed carpal tunnel syndrome and myelopathy of the cervical spinal cord with cervical radiculopathy.  Tr. 1258.  Upon exam, he had negative Tinel's and Phalen's sign, and "2 point discrimination that is 5 mm mostly with the exception of the right sided ring and small fingers."  Tr. 1266.  Buwala "showed [him] fasciculations of the first dorsal interosseous on the left side and showed me video also what appears to be intrinsic muscle spasms with flexion of the index MP joint and extension of the PIP joint and held this position until it resolved."  Tr. 1266.  Dr. Stanchowicz observed that Buwala was very stiff in his neck and with motion and wondered if it was related to the fact that he was partially fused.  Tr. 1266.  He opined that Buwala's symptoms were not from carpal tunnel but from his cervical issues.  Tr. 1266.  He offered a diagnostic/therapeutic cortisone injection, which Buwala declined.  Tr. 1266.

On January 7, 2016, Buwala saw mental health counselor Dr. Tindall and reported pain and cramping in his hands after his second motor vehicle accident.  Tr. 1270.  He stated that this made playing video games difficult.  Tr. 1270.  He reported feeling useless and discussed his eating and dieting issues.  Tr. 1270.

On January 19, 2016, Buwala saw Dr. Marchetti for a check-up.  Tr. 1321.  He was depressed over the lack of progress of his disability claim and had regained the weight he had lost; he had been eating and drinking alcohol more, sometimes a bottle of vodka a night.  Tr.

1321.  He had returned to counseling, had had two sessions, and was still not on any medication.  Tr. 1321.  Upon exam, he had an appropriate affect and grooming, normal eye contact, and a pleasant mood.  Tr. 1321.

On March 7, 2016, Buwala saw Dr. Fouad for a follow-up visit.  Tr. 1306-1307.  Upon exam, he had tenderness of his cervical spine and abnormal range of motion, and a normal gait, coordination, and sensation.  Tr. 1307.  Dr. Fouad continued Buwala's medications.  Tr. 1308.

On June 30, 2016, Buwala saw his counselor Dr. Tindall and reported experiencing less anxiety when driving and that he felt safer in his new, larger pick-up truck.  Tr. 1325, 1328.  He discussed his weekend with gaming friends and stated that he was experiencing a loss of support.  Tr. 1325.

On July 11, 2016, Buwala saw Dr. Marchetti for a check-up.  Tr. 1352.  He had gone on a four-day binge of bad food and alcohol during a gaming event but was back on track and was willing to take medication to help with his diabetes.  Tr. 1352.  His depression was well-controlled, he continued to see a counselor, and he felt he was making progress.  Tr. 1352.  He reported that he continued to lose weight and felt the best he has ever felt.  Tr. 1352.

On July 27, 2016, Buwala visited Dr. Fouad's colleague for a follow-up visit and had similar findings as his prior visit, except he also had diminished sensation to light touch in his upper extremities.  Tr. 1360.

On September 26, 2016, Buwala saw Dr. Marchetti for a check-up.  Tr. 1349.  He had gained weight since his last visit (he had not been watching his diet and started drinking again), but had recently begun Weight Watchers, had started losing weight, and felt motivated.  Tr. 1349.

On October 24, 2016, Buwala saw Dr. Fouad for a follow-up and had a normal gait,

strength, and sensation, and tenderness and a limited range of motion in his cervical spine.  Tr.
1357.

On January 6, 2017, Buwala saw Dr. Marchetti to review an ultrasound of his liver.  Tr.
1421.  Six to eight weeks prior, he had punched a door frame and his right hand was painful.  Tr.
1421.  On January 10, Buwala called Dr. Marchetti and asked for a new prescription for a
handicapped placard and Dr. Marchetti stated that she would mail it to him.  Tr. 1419.

On January 23, 2017, Buwala saw Dr. Fouad for a medication refill complaining of neck
and shoulder pain worse with bending, lifting and driving and better with medications, cold and
rest.  Tr. 1395.  Upon exam, he had tenderness of his cervical spine and mildly to moderately
abnormal ranges of motion, a normal gait, coordination, and sensation, and normal grip strength
bilaterally.  Tr. 1396.  In April 2017, he had similar complaints and similar exam findings as
before.  Tr. 1392-1393.  His weight was listed at 497 pounds.  Tr. 1392.

### C. Opinion Evidence

#### 1. Physical therapist evaluation

On September 26, 2014, physical therapist Matthew Toker issued a medical source
statement, cosigned by Dr. Donich.  Tr. 1041-1045.  Toker opined that Buwala could
occasionally lift/carry less than 10 pounds (because he was on lifting restrictions from his July
2014 surgery and had increased pain when lifting); stand for less than 30 minutes at a time, 2
hours total in an 8-hour workday and walk for less than 30 minutes at a time, one hour total in an
8-hour workday (mostly because of his weight); and sit for 30 minutes at a time and 2 hours total
in an 8-hour workday (due to neck pain and the need for neck support).  Tr. 1042.  Toker opined
that Buwala could frequently reach with both arms and could grasp and perform fine and gross
manipulation occasionally with his left hand and frequently with his right (due to right hand

numbness and increased difficulty manipulating objects with his left).  Tr. 1043.  Buwala could

never climb, could frequently twist, and could occasionally balance, squat, kneel, bend, and

stoop; he would miss 4 or more days of work per month as a result of his condition; and he was

unable to sustain any work activities for 8 hours a day, 52 weeks a year (because of increased

pain with sustained activity that requires him to take prolonged breaks).  Tr. 1044.

### 2. Treating source

On February 17, 2016, Dr. Marchetti completed a medical source statement on behalf of

Buwala.  Tr. 1304-1305.  Dr. Marchetti opined that Buwala could lift/carry less than 5 pounds

because he complained of neck pain radiating to both hands upon any sustained activity for

greater than 10 to 15 minutes.  Tr. 1304.  She stated that Buwala could stand/walk for 15 minutes

total during an 8-hour workday.  Tr. 1304.  She stated that he could sit without interruption for

10-15 minutes and also stated that he could not sit at all during an 8-hour workday.  Tr. 1304.

This finding was based on Buwala's complaints of radiating neck pain if he sits upright for more

than 10-15 minutes.  Tr. 1304.  He could never climb, balance, stoop, crouch, kneel, or crawl,

based on his history of degenerative disc disease and surgery, which, she indicated, did not help

alleviate his symptoms.  Tr. 1304.  He should avoid heights and moving machinery as they

would exacerbate his neck and hand symptoms.  Tr. 1304.  He would miss more than four days

of work per month; be off-task more than 20% of the workday; need to lie down 2 or more hours

per day; could use his hands for less than 10% of the day; and would need to take more than 4

unscheduled breaks a day due to pain and fatigue.  Tr. 1305.  When asked for the medical

findings supporting these assessments, Dr. Marchetti advised that MRI findings showed

degenerative disc disease of his cervical spine.  Tr. 1305.

On July 12, 2017, Dr. Donich wrote a letter to Buwala's personal injury attorney

regarding the second car accident, in February 2015.  Tr. 1463-1466.  Among other things, Dr. Donich advised that, due to the February 2015 car accident, Buwala was expected to experience neck pain, headaches, and sensory disturbance in his hands on an indefinite and permanent basis. Tr. 1466.  He would most likely require additional surgery in the future (revision of fusion at C3-4 and extension of fusion to C7-T1).  Tr. 1466.  He will continue to be unable to perform physically strenuous activity.  Tr. 1466.

On July 18, 2017, Dr. Tindall completed a mental medical source statement on behalf of Buwala.  Tr. 1460-1162.  Dr. Tindall opined that Buwala would have minimal to no difficulty in most areas of mental work-related functioning, including: understanding, remembering, and carrying out simple and detailed instructions; sustaining an ordinary routine without special supervision; maintaining attention and concentration for extended periods of time; completing a normal workday or workweek and working at a consistent pace without an unreasonable number or length of breaks; and working in coordination with or proximity to others without being distracted by them.  Tr. 1460.  He would have noticeable difficulty for 11-20% of the workday or workweek in the areas of: performing activities within a schedule and maintaining regular attendance and/or being punctual within customary tolerances; getting along with coworkers without distracting them or exhibiting behavioral extremes; and setting realistic goal and making plans independently of others.  Tr. 1461.  He would miss more than four days of work per month, would be off-task for 20% of the workday, and would need more than four unscheduled breaks per day which would last 20 minutes.  Tr. 1461.  When asked to describe the medical findings in support of his opinions, Dr. Tindall answered, "self-report of Mr. Buwala," which appeared to be based primarily on Buwala's physical complaints.  Tr. 1461-1462.

### 3. State Agency Reviewers

On November 2, 2015, state agency reviewing medical consultant Elizabeth Das, M.D., reviewed Buwala's file and opined that he could: lift 20 pounds occasionally and 10 pounds frequently; stand/walk for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; occasionally reach overhead; perform frequent fine and gross manipulations with his bilateral upper extremities; frequently use his right upper extremity to operate hand controls; frequently balance; and occasionally stoop, crouch, crawl, and climb ramps or stairs.  Tr. 80-83. He could never climb ladders, ropes, or scaffolds, and should avoid moderate exposure to hazards.  Tr. 80-81.

On February 2, 2016, state agency reviewing consultant Diane Manos, M.D., affirmed Dr. Das's assessments.  Tr. 93-96.

### D.  Testimonial Evidence

#### 1.  Buwala's Testimony

Buwala was represented by counsel and testified at the administrative hearing.  Tr. 39. He lives in a split-level house with his wife and two children.  Tr. 45.  His bedroom is on the upper level; the stairs do not present a problem for him because they are a half-set of stairs.  Tr. 45.  There is a basement that he utilizes "not much," maybe once a day.  Tr. 46.  Going from the basement all the way to the bedroom "isn't fun."  Tr. 46.  He drives but only limited amounts because it hurts to be in a driving position.  Tr. 46, 53.  He has no restrictions on his driver's license but anticipates that he may have restrictions in the future due to trouble with mobility in his neck and losing all the fine motor function in his hands.  Tr. 46.  This problem is in both hands but tends to be worse in his right, dominant hand.  Tr. 46-47.

Buwala is six feet tall and, at the time of the hearing, weighed 449 pounds.  Tr. 47.  He

stated that, in 2014, he weighed about 300 pounds.[2]  Tr. 47.  He attributed his weight gain to

inactivity due to his condition.  Tr. 47.  By late 2012/early 2013, after his car accident, he was

missing so much work at his parents' business that he started doing some of it from home.  Tr.

49.  Before his surgery in 2014, he was working about 2 or 3 days a week, and then he was out

for 2 months following surgery.  Tr. 49.  In January 2015 he tried to go back into the office 2-3

days a week, but then, within a few weeks, the second car accident occurred.  Tr. 49.  Currently,

he went into the office about once a month.  Tr. 50.

When asked what prevents him from working, Buwala explained that any time he

supports his head he is in pain, and after 15 or 20 minutes of sitting upright he is in more pain

than he can bear.  Tr. 53.  For example, when he tries to reconcile his checkbook at home and is

sitting at the computer, it is about 10 minutes working and then 10 minutes leaning back in the

chair waiting for the pain to subside.  Tr. 53.  Something that used to take him an hour now takes

him 3 hours.  Tr. 53.  He is slowly losing the fine motor function in his hands and he is dropping

stuff and knocking things over.  Tr. 53.  The night before, his daughter handed him a mug of ice

and when he went to grab it, his fingers spasmed and pushed it sideways and knocked it all over

the floor.  Tr. 53-54.  If he eats with his family, he has to make decisions about what food and

utensil he is going to use because sometimes his hands shake.  Tr. 54.  Between his hands, his

arms starting to not work, and his pain whenever he has to hold his head upright, he cannot do

his work as he did it before.  Tr. 53.  Emotionally, it has been difficult because he has gone from

being the guy who takes care of his family to the guy who needs help.  Tr. 53.

His condition was present after his first accident in 2012; the symptoms started to show

about six months later.  Tr. 54.  That's when he first consulted a neurosurgeon, who advised he

wait and see.  Tr. 54.  It got worse and he saw Dr. Donich, who advised that it would continue to

---

[2] Treatment notes indicates that Buwala has weighed at least about 400 pounds since June 2012.  Tr. 520, 542, 1007.

get worse unless he had fusion surgery.  Tr. 54.  After the surgery, the violent, debilitating headaches he had been having stopped.  Tr. 55.  He rarely got headaches now, and when he does it is usually because he pushed himself past the point where he can bear the pain.  Tr. 55.  He had some improvement with his hands after a few months.  Tr. 55.  He was at the point where he could evaluate if things were getting better when the second car accident occurred.  Tr. 55.

Buwala describe a typical day: he will try to have something to eat and see if his wife needs something to eat.  Tr. 55.  He'll use his smartphone if he can to see if there are any emails or things from the office he needs to forward to people.  Tr. 55.  Then he just tries to stay busy and not get depressed.  Tr. 55.  He might try to scrub a pan or sort through some paperwork or do something where he feels useful to his family; it just takes him a lot of time.  Tr. 55.  His daughter will be going back to school so he'll probably start picking her up or dropping her off.  Tr. 55.  His son got his first job and will need picked up and dropped off.  Tr. 56.  He mostly does things like that; simple household stuff and occasionally forwarding emails back and forth with work and then he will read and go to bed.  Tr. 56.  Currently he uses a Kindle Paperwhite to read but he thinks he needs something heavier because he is having trouble holding it still.  Tr. 56.  He usually reads 2 or 3 fiction books, then a non-fiction book.  Tr. 56.

Buwala is able to dress and brush his teeth.  Tr. 58.  He has issues with shaving and his wife has helped him a couple of times.  Tr. 59.  Usually when he goes to get his hair cut the barber will trim his beard for him.  Tr. 59.  He is able to do buttons, but there are some he has difficulty with.  Tr. 59.  He has almost no feeling in his right thumb and has started to experience numbness in his left index finger.  Tr. 59.  The last 2-3 months he has also started having issues in his forearms.  Tr. 59.  He gets muscle cramps with some motions caused by his muscles atrophying and it feels like a charley horse in a muscle in the middle of his forearm.  Tr. 59.  He

gets these cramps 4-5 times a day.  Tr. 59.  He sleeps in an adjustable bed; before that, he slept in

a regular bed and would have intense pain after 20 minutes.  Tr. 60.  He would have to get up

and sleep in a recliner.  Tr. 60.  In his adjustable bed, he can take the weight off his head and

neck and he estimated he got about five hours of sleep a night.  Tr. 61.  Once or twice a week he

may nap for about an hour.  Tr. 61.  He also experiences daily swelling in his neck, caused by

stiches deep inside that occasionally irritate things and sometimes leaks and he has to bandage it.

Tr. 62.  After a few weeks it clears up.  Tr. 62.  He is able to look down without too much of a

problem but cannot look up; looking left and right are limited and if he is driving and there is a

really sharp turn and he has to look over his shoulder he is in pain.  Tr. 62.  His providers are in

agreement that another surgery is not advisable, as it would be another very major, expensive

surgery and there is no guarantee that it would improve his current symptoms or not cause

additional complications.  Tr. 58.

Buwala has been doing Weight Watchers online to track what he has been eating.  Tr. 63.

Eating was a way to cope with depression.  Tr. 63.  He takes Gabapentin for the nerve pain in his

hands.  Tr. 63.  They just upped the dosage and one of the side effects is that he loses his

balance; he has fallen twice in the past week.  Tr. 63.  He has to be careful stepping off curbs.

Tr. 63.  He also takes Percocet and a muscle relaxer, which he tries to take as sparingly as

possible.  Tr. 63.  When he takes it, he is not as sharp.  Tr. 63.  When the pain is bad he makes

mistakes and misses details in his work, like missing an item when quoting a job.  Tr. 64.  If he

pushes himself, his neck pain will eventually spread through his shoulders and, rarely, turn into a

bad headache.  T. 64.

Buwala sees Brian Tindall for counseling for his depression.  Tr. 57.  He was seeing him

every week up until about a month ago but was now seeing him every other week, mostly due to

the cost. Tr. 57. When asked to explain his depressive symptoms, Buwala stated that he cries a lot easier than he used to. Tr. 57. He used to play video games with a group of friends but as his hands deteriorated he has been unable to play; they have been supportive and suggests he still get online and stay in the background and talk to them. Tr. 57. As his depression got worse he started to withdraw from everybody around him. Tr. 57. He stopped talking to his gaming friends, the guy in town he likes to talk politics with, and he stopped doing everything that he found joy in before. Tr. 57. He is fighting back now but it's hard to stay optimistic when you can do less and less every day. T r. 57. When his depression was really bad he drank a little too much, but it's not something he has a problem with. Tr. 58. He also has mild PTSD for being in two car accidents and sometimes when he is driving he will freeze. Tr. 65.

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing. Tr. 66-72. The ALJ asked the VE to determine whether a hypothetical individual of Buwala's age, education and work experience could perform Buwala's past work or any other work if that person had the limitations assessed in the ALJ's RFC determination, and the VE answered that such an individual could perform Buwala's past work as a sales director, not as he performed it but per the Dictionary of Occupational Titles, and other jobs in the national economy such as receptionist, scheduler, and office clerk. Tr. 67-69.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in
> the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to

follow a five-step sequential analysis set out in agency regulations.  The five steps can be

summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must
   be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a
   severe impairment that has lasted or is expected to last for a continuous
   period of at least twelve months, and his impairment meets or equals a
   listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ
   must assess the claimant's residual functional capacity and use it to
   determine if claimant's impairment prevents him from doing past relevant
   work.  If claimant's impairment does not prevent him from doing his past
   relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if,
   based on his vocational factors and residual functional capacity, he is
   capable of performing other work that exists in significant numbers in the
   national economy.

20 C.F.R. §§ 404.1520, 416.920;[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

---

[3] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations
to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20
C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to
the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his September 18, 2017, decision, the ALJ made the following findings:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.  Tr. 17.

2.   The claimant has not engaged in substantial gainful activity since July 15, 2014, the alleged onset date.  Tr. 17.

3.   The claimant has the following severe impairments: obesity, degenerative disc disease of the cervical spine, with stenosis, myelopathy and radiculopathy, status-post surgery [hereinafter, collectively, the "cervical impairment], and mild carpal tunnel syndrome/paresthesias/mild median nerve compression of the right wrist [hereinafter, collectively, "carpal tunnel syndrome"].  Tr. 17.

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 20.

5.   The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that the claimant may occasionally push and/or pull, including the operation of hand controls, with the bilateral upper extremities; the claimant may frequently handle, finger and reach overhead with the bilateral upper extremities; the claimant may occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds; the claimant must avoid all exposure to workplace hazards, including unprotected heights, dangerous moving machinery and commercial driving.  Tr. 21.

6.   The claimant is capable of performing past relevant work as a sales manager, having a sedentary exertional level designation [but which the claimant performed at the light level of exertion] and a specific vocational preparation factor of eight.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.  Tr. 28.

7.   The claimant has not been under a disability, as defined in the Social

Security Act, from July 15, 2014, through the date of this decision.  Tr. 29.

## V. Plaintiff's Arguments

Buwala challenges the ALJ's decision on two grounds: the ALJ erred when he did not find Buwala's mental impairments to be severe at step two and when assigning little weight to Buwala's treating physician.  Doc. 13.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not err at step two

Buwala argues that the ALJ erred at step two when he did not find his mental impairments to be severe.  Doc. 13, pp. 18-20.

Step two is a *de minimis* hurdle such that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  When an ALJ finds both severe and non-severe impairments at step two and continues with subsequent steps in the

23

sequential evaluation process, error, if any, at step two may not warrant reversal.  *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the failure to find an impairment severe at step two is not reversible error when the ALJ continues through the remaining steps of the evaluation and can consider non-severe impairments when assessing an RFC); *Anthony v. Astrue*, 266 Fed. App'x 451, 457 (6th Cir. 2008); *Hedges v. Comm'r of Soc. Sec.*, 725 Fed. App'x 394, 395 (6th Cir. 2018) ("So whether the ALJ characterized Hedges' mental-health impairments as severe or non-severe at step two is 'legally irrelevant' and does not amount to error.").

Here, the ALJ stated that he did not find Buwala's mental health impairments to be severe.  Tr. 19.  The ALJ found that Buwala had severe physical impairments and continued through the remaining steps of the evaluation.  He had an opportunity to consider Buwala's mental impairments when assessing his RFC and did consider his mental impairments when assessing his RFC (Tr. 20, 26); thus, the ALJ's failure to find Buwala's mental impairments not severe is not reversible error.  *Maziarz*, 837 F.2d at 244; *Fisk v. Astrue*, 253 Fed. App'x 580, 583-584 (6th Cir. 2007) ("When an ALJ determines that one or more impairments is severe, the ALJ must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not severe ... an ALJ's failure to find additional severe impairments at step two does not constitute reversible error," quoting SSR 96–8p, 1996 WL 374184, at *5; *Maziarz*, 837 F.2d at 244); *Nejat v. Comm'r of Soc. Sec.*, 359 Fed. App'x 574, 577 (6th Cir. 2009); *Kirkland v. Comm'r of Soc. Sec.*, 528 Fed. App'x 425, 427 (6th Cir. 2013).

In support of his argument that the ALJ did not consider limitations from his depression when formulating his RFC assessment, Buwala cites to the opinion of Dr. Tindall, his mental health counselor.  Doc. 13, pp. 19-20.  But the ALJ explained why he gave "little" weight to Dr.

Tindall's opinion, a finding that Buwala does not challenge.  Tr. 26.  The ALJ summarized Dr.

Tindall's opinion and accurately stated that Dr. Tindall noted in his opinion that his assessed

limitations were based on Buwala's self-reports and cervical pain.  Thus, the ALJ found that Dr.

Tindall relied on Buwala's subjective complaints and, to the extent his assessed limitations were

based on Buwala's cervical pain, reported outside the bounds of his professional certification and

specialty.  Tr. 26.

The ALJ also remarked that the limitations assessed by Dr. Tindall were not supported by

the record.  Tr. 26.  Previously in his decision, the ALJ explained that Buwala engaged in skilled

work and the record showed no deficits of his comprehension or memory functions; treatment

notes regularly reported that he was pleasant, calm, cooperative, and with normal eye contact; he

was not observed to have difficulties concentrating; and he was able to engage in daily activities

such as household chores, taking his child to school, managing finances and an email account,

engaging in religious activities, and working part-time.  Tr. 19.  Buwala does not challenge any

of these findings by the ALJ.  Instead, he simply recites Dr. Tindall's limitations and argues that

they are supported by the record.  The ALJ disagreed, and his decision is supported by

substantial evidence.  There is no basis for reversing the ALJ's decision based on his step two

determination.  *Maziarz*, 837 F.2d at 244.

Finally, Buwala complains that the ALJ did not discuss his mental health treatment

records, Doc. 17, p. 1, but an ALJ is not required to discuss every piece of evidence in the

record, *Thacker v. Comm'r of Soc. Sec.*, 99 Fed. App'x 661, 665 (6th Cir. 2004).  Buwala argues

that "it is blatantly obvious" the ALJ did not consider his mental impairments when formulating

his RFC because he failed to include any mental limitations.  Doc. 17, p. 1.  However, the fact

that the ALJ did not include mental limitations in his RFC does not mean that the ALJ did not

consider them.  The ALJ found that Buwala had no more than mild limitations due to his mental impairment, his mental impairment was not severe, and his mental impairment did not require limitations in his RFC assessment; this was not error.

### B. The ALJ did not violate the treating physician rule

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).  If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole.  *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

Buwala argues that the ALJ erred when he failed to give great weight to Dr. Marchetti's opinion.  Doc. 13, p. 20.  The ALJ considered Dr. Marchetti's opinion as follows:

> The claimant's primary care physician, Pennie Marchetti, M.D., indicated that the claimant could lift and carry less than five pounds, stand and walk less than fifteen minutes per eight hours, sit ten-to-fifteen minutes per eight hours, could never engage in postural activities, could have limited exposure to heights or moving machinery, would miss more than four days per month, be off-task twenty percent of the time, would need to lie down two of eight hours and could use his hands less than ten percent of the workday.  Dr. Marchetti has treated the claimant over a lengthy period and was reporting within the bounds of her professional certifications.  However, the claimant appears to have faithfully attended his appointments as scheduled, such that there appears no objective basis for the limitations relevant to absenteeism or off task behavior.  The

restrictions are not consistent with the overall evidence of record, discussed in digest form in the analysis of the opinions of Drs. Das and Manos, above.  The medical basis for this opinion is given as the "reports of the patient" and the "patient's symptoms" (16F/1), which suggests quite strongly that Dr. Marchetti has allowed the substitution of her own judgment for that of the claimant's, and has been content to serve as the claimant's scrivener only.  This opinion is not even marginally supported by, or consistent with, the overall evidence of record.  As a consequence, it is not accorded controlling weight, rather, it is accorded little weight.

Tr. 26.  Previously, when discussing the opinions of Drs. Das and Manos, the ALJ remarked that they opined that Buwala could perform work at the light exertional level, with limitations on bilateral reaching and fine and gross manipulation, and on the use of hand controls with the right hand.  Tr. 24.  The ALJ gave these opinions partial weight, and assessed an RFC that was more restrictive (sedentary work, greater bilateral upper extremity limitations), explaining,

> The record shows a claimant with a cervical impairment improved, after surgery, to the extent that there is no compressive pathology at any vertebral level, even after a post-surgical auto accident (10F/108, 115), and with mild carpal tunnel syndrome (7F/162), stable over time (14F/11), whose clinical examinations typically report restriction of cervical range of motion, but normal, residual strength, sensation, coordination, and grip (8F/5, 23F/2), and who retains an array of activities of daily living of sufficient breadth to encompass simple household chores, daily exercise, and part-time work (hearing testimony), (13D), (23F/1).  In addition; ... the claimant is obese, and there is direct medical evidence to suggest that this impairment impedes his ability to stand and/or walk (10F/138).  Given this additional adversity, restriction to sedentary work is appropriate.  Expanding the restriction on hand controls to both extremities is also warranted, given the history of mild carpal tunnel syndrome in both extremities (7F/162), and wholesale restriction from workplace hazards is warranted, even if only on a precautionary basis, against sudden "bursts" of pain.

Tr. 25.

Buwala argues that the record supports Dr. Marchetti's limitations.  Doc. 13, p. 21.  He reiterates that Dr. Marchetti has treated him since before his alleged onset date and saw him at least 18 times during the relevant period.  Doc. 13, p. 22.  However, the ALJ recognized the lengthy treatment relationship.  Tr. 26.  Buwala recites the diagnostic imaging in the record (Doc. 13, p. 22; Doc. 17, p. 3), which the ALJ considered.  Tr. 22-23.  Buwala recites physical

observations during visits and his subjective complaints (Doc. 13, pp. 22-23); the ALJ considered Buwala's subjective complaints and physical exam findings.  Tr. 22-23.  Buwala does not identify any error with respect to the ALJ's recitation of this evidence; instead, he disagrees with the ALJ's conclusion, which is not a basis for reversal.  *See Garner*, 745 F.2d at 387 (A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility.").

Buwala asserts that Dr. Marchetti's opinion is supported by a functional capacity evaluation performed on September 26, 2014.  Doc. 13, p. 23.  Presumably, he is referring to an evaluation completed by physical therapist Matthew Toker a little over two months after Buwala's cervical fusion surgery.  The ALJ explained why he did not credit this opinion: notably, it was a set of post-surgery restrictions not expected to last 12 months.  Tr. 25.  Buwala does not challenge the ALJ's findings with respect to this opinion.

Finally, Buwala states that the record as a whole supports Dr. Marchetti's opinions that he would be off-task for over 20% of a workday and would miss 4 days a month, which, Buwala asserts, would alone render him disabled.  Doc. 13, p. 24.  Again, the ALJ disagreed.  Buwala does not point to a specific error on the part of the ALJ; instead, he disagrees with the ALJ's decision.  The ALJ's decision is supported by substantial evidence and should be affirmed.  *See Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion, even when substantial evidence may support the claimant's position).

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: April 12, 2019

*/s/ Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).